UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| M.B. III, a minor, by and through his Guardian Ad Litem, TITICE BEVERLY, individually and as Successor in Interest and Personal Representative of the Estate of MILTON BEVERLY, JR., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | No. 2:17-cv-02395-WBD-DB<br><br><u>ORDER RE: MOTION TO DISMISS FOURTH AMENDED COMPLAINT</u> |

----oo0oo----

Plaintiffs M.B. III, a minor, by and through his guardian ad litem, Titice Beverly, and Twyller Weary[1] brought this action, individually and as successors in interest to the estate of Milton Beverly ("decedent"), alleging violations of

---

[1] Plaintiff M.B. III is the biological son, successor in interest, and personal representative of the estate of his father, decedent. Plaintiff Twyller Weary is the mother, successor in interest, and personal representative of the estate of her son, decedent.

1

state law and decedent's constitutional rights. These claims arise out of decedent's suicide while incarcerated at California State Prison-Sacramento. Presently before this court is a Motion to Dismiss Plaintiffs' Fourth Amended Complaint (Docket No. 62) brought by defendants Todd Mannes, Kyle Mohr, Andrew Ballard, Stacy Vue, Ken Brown, Michael Munroe, and A. Dutton ("individual defendants").

I   Factual and Procedural Background

Decedent was convicted of various crimes. (Fourth Am. Compl. ("4AC") ¶ 17 (Docket No. 58).) While in custody in the County of Los Angeles, decedent attempted suicide and was placed on suicide precautions. (Id.) Decedent was sentenced and transferred to Vacaville Mental Health Facility, where he was subject to various suicide prevention measures. (Id. ¶ 18.) Decedent was subsequently transferred to North Kern State Prison in Delano, California; while there, he again attempted suicide. (Id. ¶ 19.) On or about April 11, 2016 decedent was transferred from North Kern State Prison to California Medical Facility, where he was placed in an enhanced outpatient program for mental health care. (Id. ¶¶ 20-21.) On June 2, 2016, Decedent was then transferred to California State Prison-Sacramento ("CSP-Sac"). (Id. ¶ 22.)

Plaintiffs allege that while decedent was at CSP-Sac, decedent showed suicidal signs and symptoms. (Id. ¶ 32.) They allege that on or around September 1, 2016, decedent was identified as having a disability and was transferred from the special housing unit to "B-5" housing for participants in the Enhanced Outpatient Program for mental health care. (Id. ¶ 26.)

2

They also allege that on September 25, 2016, defendant Dutton conducted a mental health evaluation of decedent. (Id. ¶ 66.)

Plaintiffs claim that in both October and November 2016, decedent "unequivocally and repeatedly expressed his intention to kill himself" while speaking with family members on a recorded and monitored telephone line. (Id. ¶ 29.) Plaintiffs also allege that in October of 2016, decedent's sister attempted to reach CSP-Sac personnel by telephone and received no response, and that decedent's sister sent a letter dated November 1, 2016, in which she notified CSP-Sac personnel that she feared decedent's condition was worsening. (Id. ¶ 28)

The Fourth Amended Complaint alleges that defendants had reviewed prison records relating to decedent which chronicled his previous suicide attempts and previous placement in a "crisis" bed. (Id. ¶¶ 40-41.) The defendants also periodically searched decedent's cell and therefore, the complaint alleges, "would have seen notes and other writings by decedent referencing suicide and expressing suicidal ideation." (Id. ¶ 42.) Despite defendants' knowledge of decedent's serious medical needs, the complaint alleges, defendants failed to perform hourly "cell checks" on decedent's cell as required by prison policy or procedure. (Id. ¶¶ 60-65.) Defendants also housed decedent in a cell with access to bedsheets, despite knowledge of the fact that inmates with a heightened risk of suicide should not be given materials from which ligatures could be made. (Id. ¶ 31).

II. Legal Standard

On a Rule 12(b)(6) motion, the inquiry before the court is whether, accepting the allegations in the complaint as true

3

and drawing all reasonable inferences in the plaintiff's favor, the plaintiff has stated a claim to relief that is plausible on its face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

III. Discussion

Individual defendants now seek to dismiss all claims against them on the following grounds: (1) plaintiffs fail to allege sufficient facts to state a 42 U.S.C. § 1983 claim against the individual defendants; (2) the individual defendants are entitled to qualified immunity on plaintiffs' federal claims; (3) plaintiffs fail to state a claim for negligence or failure to summon medical care; and (4) plaintiffs' state law claims are barred by statutory immunities.

    A.    Section 1983 claims against the individual defendants

        1.    Individual liability under 1983

In their first claim, plaintiffs allege that the individual defendants acted with deliberate indifference toward decedent's serious medical needs and safety.

To state a claim under 42 U.S.C. § 1983 for a violation of the Eighth Amendment based on inadequate medical care of a prisoner, a plaintiff must show both that the prisoner had "serious medical needs" and that the defendants' acts or omissions were "sufficiently harmful to evidence deliberate

4

indifference" to those needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

Plaintiffs have presented substantial evidence that the decedent had a heightened risk of suicide,[2] and under Ninth Circuit law, risk of suicide or an attempted suicide constitute a serious medical need.  Conn v. City of Reno, 591 F.3d 1081, 1095 (9th Cir. 2010) (citing Doty, 37 F.3d at 546), vacated, City of Reno v. Conn, 563 U.S. 915 (2011), reinstated in relevant part, Conn v. City of Reno, 658 F.3d 897 (9th Cir. 2011).

Plaintiffs' first claim for deliberate indifference under the Eighth and Fourteenth Amendments against individual defendants Mohr, Ballard, Munroe, Brown, and Vue, all correctional officers at CSP-Sacramento who were named in the Third Amended Complaint (Docket No. 31), as well as against defendant Manes, a correctional officer at CSP-Sacramento who was acting in a supervisory capacity at the time of decedent's death.  (4AC ¶ 6.)  The same charges are also levied against A. Dutton, PsyD, who was not previously named.  For reasons of clarity, the court will separately consider the merits of the first claim with respect to defendants Mohr, Ballard, Munroe, Manes, Brown, and Vue ("correctional officer defendants"), and with respect to defendant Dutton.

---

[2] Plaintiffs allege, inter alia, that: decedent had attempted suicide twice in the period following his conviction (4AC ¶¶ 17 & 19); decedent had notes in his cell which included the statements "I fear living instead of fearing death" and "forgive my early departure.  I harbor a fascination of death (id. ¶ 42); and that in the weeks preceding his suicide, defendant made several telephone calls to his sister and mother in which he "unequivocally and repeatedly expressed his intention to kill himself."  (Id. ¶ 29.)  Thus, the complaint has alleged that in the period immediately preceding his death, the decedent was at a high risk of suicide.

Under Ninth Circuit case law, to be deliberately indifferent, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need." McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

The Fourth Amended Complaint presents the following facts in support of its claim that the correctional officer defendants were deliberately indifferent to decedent's serious medical needs: (1) the correctional officer defendants "accessed and reviewed" prison records which detailed decedent's history of suicide attempts and previous placement in a "crisis bed" (4AC ¶ 40); (2) the decedent's phone calls were recorded and monitored and in the weeks and days leading up to his suicide decedent made several phone calls to family members in which he "unequivocally and repeatedly expressed his intention to kill himself" (Id. ¶ 29); and (3) the defendants periodically carried out cell searches in which they may have had occasion to encounter notes written by the defendant like those found in his cell at the time of death, which stated, "forgive my early departure. I harbor a fascination of death," and "I fear living instead of fearing death." (Id. ¶ 42.)

Of those allegations which were added to the Fourth Amended Complaint, only one speaks to what the defendants knew, or should have known, about decedent's mental health at the time

of his death.  That is the claim that defendants "accessed and reviewed" prison records documenting decedent's previous suicide attempts and previous placement in a "crisis bed."  (Id. ¶ 40.)  This allegation, combined with decedent's placement in the Enhanced Outpatient Program, indicates that the defendants had actual or constructive knowledge of decedent's history of suicide and eligibility for the prison's Enhanced Outpatient Program level of mental health care.  Given the months that had elapsed between decedent's prior suicide attempts and his death, however,[3] this allegation is insufficient to show that any defendant knew of decedent's serious medical need in the period immediately preceding his death.  Cf. Shepard v. Hansford Cty., 110 F. Supp. 3d 696, 709 (N.D. Tex. 2015)("previous suicide attempts that are remote in time are insufficient, standing alone, to establish a substantial risk of suicide.").

        Like the allegations in the Third Amended Complaint, the other allegations new to the Fourth Amended Complaint, i.e., those regarding the notes in decedent's cell and his telephone conversations, do not adequately link specific facts to specific defendants.  Absent allegations that specific correctional officer defendants heard recordings of decedent in which he expressed suicidal ideations, the mere fact that decedent's telephone calls were recorded and monitored does not speak to whether or not any specific defendant in this case was

---

[3] The Fourth Amended Complaint does not specify the dates on which decedent's previous suicide attempts occurred, but it can be inferred that they took place before his June 2, 2016 transfer to CSP-Sac.  (See 4AC ¶¶ 17-22.)  This means that both suicide attempts took place at least five months before his death in late November, 2016.

7

subjectively aware of decedent's serious medical needs in the period immediately preceding his death.  Similarly, the facts that correctional officers periodically searched inmates' cells and that there were notes expressing suicidal ideations found in decedent's cell following his death do not necessarily mean that any individual correctional officer defendant was aware of the notes' contents in the period immediately preceding decedent's suicide.

For these reasons, the court must conclude that with respect to defendants Manes, Mohr, Ballard, Munroe, Brown and Vue, plaintiffs still have not alleged sufficient facts to establish the individual defendants' subjective awareness of the decedent's medical needs.  Since there can be no "deliberate indifference" without such knowledge, see Farmer 511 U.S. at 837, the court will dismiss the Fourth Amended Complaint's first claim as alleged against defendants Manes, Mohr, Ballard, Munroe, Brown and Vue.

The Fourth Amended Complaint's first claim also alleges that defendant Dutton was deliberately indifferent to decedent's serious medical needs.  (4AC ¶ 66.)  According to the Fourth Amended Complaint, approximately 8 weeks before decedent's suicide, defendant Dutton conducted a Mental Health Evaluation of decedent.  (Id.)  Allegedly, he then "failed to implement appropriate medical treatment following the evaluation[,]" "failed to implement policies on suicide prevention and reporting[,]" "failed to document or alert other staff of decedent's suicidal behavior and/or ideation[,]" and failed to "order or complete a follow up Mental Health Evaluation[.]"

(Id.)

Though the Fourth Amended Complaint does establish that decedent had a serious medical need in the period immediately preceding his death, there are not sufficient allegations that he had a serious medical need eight weeks before his death, at the time of his evaluation with Dr. Dutton. Likewise, none of the allegations suggest that, based on his September 25, 2016 evaluation with decedent, Dr. Dutton was subjectively aware that decedent would have a serious medical need nearly two months later.

Even when the court takes the facts alleged in the Fourth Amended Complaint as true and construes them in the light most favorable to the plaintiffs, the claim that defendant Dutton violated decedent's constitutional right by deliberate indifference to decedent's serious medical need is not plausible. Accordingly, the court will grant defendants' Motion to Dismiss plaintiffs' first claim as alleged against defendant Dutton.

2. Supervisory liability under 1983

A supervisor may be held liable under section 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

1989).

Supervisory liability under 1983 cannot exist without an underlying constitutional violation. The Fourth Amended Complaint does not present a plausible claim that any of the correctional officers supervised by defendant Manes violated decedent's constitutional rights. As a result, it cannot and does not adequately allege that defendant Manes has supervisory liability for either policies, customs, or practices causing a constitutional violation; negligent hiring; or failure to train and supervise causing a constitutional violation.

B. <u>Qualified Immunity</u>

For the foregoing reasons, the facts pled in plaintiffs' Fourth Amended Complaint do not plausibly allege any violations of decedent's constitutional rights. <u>See</u> <u>supra</u> III.A. However, even assuming defendants violated decedent's constitutional rights, they would be entitled to qualified immunity.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). In determining whether a government official is entitled to qualified immunity, the court must "decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and "if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established'

at the time of defendant's alleged misconduct." Id. at 232 (citations and quotations omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 946 (9th Cir. 2017) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)).

Here, for the following reasons, even if plaintiffs had alleged facts showing a violation of a constitutional right, the court concludes that the applicable law was not clearly established at the time of the conduct at issue in this case.

Writing less than two years before decedent's death, the Supreme Court stated that "[n]o decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols." Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015). Plaintiffs identify several factual differences between the facts in the instant case and those at issue in Taylor and "contend that defendants' conduct violated a clearly established statutory or constitutional rights [sic] of which a reasonable person would have known." (Pls.' Opp. to Defs' Mot. to Dismiss 4AC at 6 (Docket No. 65).) They do not, however, cite any case law supporting this contention or suggesting that that the Supreme Court's case law on a prisoner's right to the proper implementation of adequate suicide prevention protocols changed between the time of the Taylor decision and the time of decedent's death.

Though a Ninth Circuit precedent is "sufficient to clearly establish the law within [the Ninth Circuit]," Perez v.

City of Roseville, 882 F.3d 843, 857 (9th Cir. 2018), the sparse case law in this circuit on correctional officers' obligation to prevent the suicides of inmates they know to be suicidal does not, taken as a whole, indicate that defendants violated a right of decedent's that was so well established that all reasonable officers would understand that right was violated by their conduct, i.e., failing to check on decedent at regular intervals and placing him in a cell with bedsheets.

In Horton by Horton v. City of Santa Maria, No. 15-56339, 2019 WL 405559 (9th Cir. Feb. 1, 2019), the Ninth Circuit recently considered whether an officer who failed to immediately check on a detainee after learning the detainee's mother considered the detainee suicidal was entitled to qualified immunity with respect to § 1983 claims arising out of the detainee's suicide. The court held that because case law at the time of the incident - - late 2012 - - did not clearly establish that a reasonable officer would recognize a constitutional duty to check on the detainee in those circumstances, the officer was entitled to qualified immunity.

The court in Horton distinguished the facts at issue in that case from those of two earlier cases in which the Ninth Circuit had found that officers who failed to provide medical assistance to detainees should have known their conduct was unconstitutional. Id. at *6-*7. In Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir. 2010), overruled by Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016), the court denied qualified immunity to a mental health specialist who removed a detainee from suicide monitoring and had the detainee's

12

clothes and bedding returned to him.  In that case, the mental health specialist knew that the detainee was suicidal, knew that the detainee had a history of suicide attempts, and was given notes saying that the detainee was put in an anti-suicide smock and needed to be "constantly monitored throughout the day to ensure his safety."  Id. at 1244.  In Conn v. City of Reno, 591 F.3d 1081 (9th Cir. 2010), vacated, 563 U.S. 915 (2011), opinion reinstated in relevant part, 658 F.3d 897 (9th Cir. 2011), the Ninth Circuit denied qualified immunity at the summary judgment stage to officers who, while transporting a detainee to jail, observed the detainee attempt to choke herself with a seatbelt and make suicidal threats, but nonetheless did not tell jail officers of that conduct.  Id. at 1092.  The Ninth Circuit held that, "[w]hen a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety."  Id. at 1103.

In both Conn and Clouthier there was an imminent, rather than chronic, suicide risk that was ignored by defendant officers who were aware of that looming risk.  In contrast, the facts in this case, as in Horton, do not suggest that the decedent's suicide risk on the day of his death was especially acute.  Thus, at the time of the incident, there was no case law clearly establishing that, absent some moment of punctuated crisis, officers have an obligation to implement particular suicide-prevention protocols.

The lack of clarity surrounding the scale and scope of suicide prevention measures to which prisoners are

13

constitutionally entitled is also illustrated by the juxtaposition between plaintiffs' allegations regarding decedent's housing placement and the case law on this issue. Plaintiffs' allegation that "B-5 was a housing assignment with less monitoring and supervision for inmates, including decedent, than the SHU available housing at CSP-Sacramento," (4AC ¶ 26) apparently implies that the choice to house decedent in B-5 rather than the better supervised SHU is somehow indicative of defendants' "deliberate indifference" towards decedent's suicide risk. However, at least one court has considered a suicidal prisoner's placement in the SHU as a factor evidencing correctional officer defendants' reckless indifference to that prisoner's medical needs. See DeJesus v. State, 210 F. Supp. 3d 620 (D. Del. 2016). This court has also held that placing mentally ill inmates in SHUs without certifications from their clinicians violated those inmates' Eighth Amendment rights, in part because "for seriously mentally ill inmates, placement in California's segregated housing units, including both administrative segregation units and SHUs, can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide." Coleman v. Brown, 28 F. Supp. 3d 1068, 1105 (E.D. Cal. 2014) (Karlton, J.).

Plaintiffs' suggestion that decedent's suicide could have been avoided if he were housed in the SHU and thereby subject to greater supervision is not unreasonable on its face. At the same time, however, the case law suggests just the opposite, that such a placement could constitute indifference to

14

an inmate' medical needs and infringe on an inmate's Eighth Amendment rights. This contrast tends to confirm that the law is not clearly established with respect to what, precisely, the specific constitutional obligations of correctional officers are vis-à-vis inmates with heightened suicide risk.

Regardless of whether the defendants in this case were deliberately indifferent to decedent's serious medical needs, the case law at the time of decedent's death did not clearly establish that a reasonable officer in defendants' shoes should have recognized that, by failing to regularly check on decedent and failing to remove his bedsheets, he or she was violating decedent's constitutional rights. Defendants are therefore entitled to qualified immunity.

Overall, the Fourth Amended Complaint has not pled facts which, taken in the light most favorable to plaintiffs, give rise to a facially plausible legal claim under § 1983. Moreover, even in the event that the defendants did somehow infringe decedent's constitutional rights, they are entitled to qualified immunity because, absent a clearly delineated suicidal episode, prisoners do not have a "clearly established" right to particular suicide prevention protocols. Accordingly, the court will grant defendants' Motion to Dismiss plaintiffs' First, Second and Third claims as alleged against all defendants.

IV. State Law Claims

Plaintiffs' fourth and fifth claims are state law claims and this court's jurisdiction over them is based on pendant jurisdiction under 28 U.S.C. § 1367. Given the dismissal of plaintiffs' federal law claims, discussed supra, the court

will also dismiss plaintiffs' pendant state law claims.  See
United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("if the
federal claims are dismissed before trial, even though not
insubstantial in a jurisdictional sense, the state claims should
be dismissed as well.").  This dismissal will be without
prejudice.  See Brandwein v. California Bd. of Osteopathic
Exam'rs, 708 F.2d 1466, 1475 (9th Cir. 1983).

        IT IS THEREFORE ORDERED that the individual defendants' Motion to Dismiss (Docket No. 62) be, and the same hereby is, GRANTED.  Because plaintiffs have already been given leave to amend their complaint three times, and it does not appear that further amendment could improve upon their allegations, plaintiffs' First, Second and Third claims are dismissed with prejudice.  Plaintiffs' Fourth and Fifth claims are dismissed without prejudice to refiling in state court.  The Clerk of Court is instructed to close this case.

Dated:  February 8, 2019

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE